**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ANDERSON DIVISION**

| | |
|---|---|
| William Robert Bates, Jr.,     ) | Civil Action No. 8:09-3355-MBS |
| )| |
| Plaintiff,   ) | |
| )| |
| vs.    ) | |
| )| **ORDER AND OPINION** |
| Michael J. Astrue,   ) | |
| Commissioner of Social Security,   ) | |
| )| |
| Defendant.   ) | |
| )| |

On December 30, 2009, Plaintiff William Robert Bates, Jr. filed the within action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, as amended (the "Act") seeking judicial review of a final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB"). In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Bruce Howe Hendricks for pretrial handling. On August 23, 2010, Plaintiff filed his brief addressing the issues in the case. On October 6, 2010, Defendant filed a Memorandum in Support of the Commissioner's Decision. On November 30, 2010, Plaintiff responded to Defendant's Memorandum in Support of the Commissioner's Decision. On January 21, 2011, the Magistrate Judge filed a Report and Recommendation recommending that Defendant's decision to deny benefits be affirmed. On February 15, 2011, Plaintiff filed objections to the Report and Recommendation seeking an award of Social Security benefits or a remand of the case for a rehearing before the ALJ. *See* Pl. Obj. at 5. On February 18, 2011, Defendant responded to Plaintiff's objections.

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this court.

*Mathews v. Weber*, 423 U.S. 261, 270 (1976). The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1). The district court is obligated to conduct a *de novo* review of every portion of the Magistrate Judge's report to which objections have been filed. *Id.*

## I. FACTS

On November 21, 2005, Plaintiff filed an application for DIB, alleging disability beginning on January 24, 2005. R. at 121.[1] Plaintiff alleges he is disabled due to a pituitary tumor, hearing problems, sleep disorder, seizures, headaches, "wasting of body fat," severe fatigue, and depression. R. at 134, 162. Plaintiff's claims were denied initially and upon reconsideration. R. at 89, 90. On May 27, 2008, a hearing was held before an administrative law judge ("ALJ") at which Plaintiff, Plaintiff's mother, and a vocational expert testified. R. at 36. On June 27, 2008, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. R. at 15-35. On September 17, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. R. at 8. On October 30, 2009, the Appeals Council set aside its denial of review to consider additional information, and again denied Plaintiff's request for review. R. at 1. As a result, the ALJ's decision became the final decision of Defendant. *Id.*

---

[1] Plaintiff also filed an application for DIB on January 28, 2002, alleging disability beginning May 2, 2001. Plaintiff's 2002 application was denied by the Commissioner. The district court subsequently affirmed the Commissioner's decision denying benefits. *Bates v. Barnhart*, Civil Action No. 8:05-2977-MBS-BHH (D.S.C. Oct. 10, 2006).

A.    **Plaintiff's Medical Records**

1.    Plaintiff's Medical History Prior to alleged Onset Date

Prior to the alleged onset date, Plaintiff was treated for the following: cranial trauma and permanent hearing loss from an explosion, seizure disorder, pituitary macroprolactinoma, hypothyroidism, hypercholesterolemia, depression, testosterone deficiency, complaints of muscle atrophy/wasting, and sleep apnea. R. at 287, 187, 289-90, 317. Plaintiff also complained of loss of fat, decreasing strength, weakness, "drying up," decreased libido, and growth hormone deficiency. R. at 269, 283-86, 294, 297, 300, 305.

2.    Plaintiff's Medical History From the Alleged Onset Date Through the Date Last Insured

On February 21, 2005, Plaintiff presented to Dr. Eric J. Heinzelmann ("Heinzelmann"), a gastroenterologist, with "complaints of losing fat in his upper extremities and shoulders," "gaining weight in his midabdomen," and "periumbilical fat." R. at 390-91. Plaintiff complained to Heinzelmann that "doctors are not listening to him when he states something is wrong and he is 'all dried up.'" R. at 390. Heinzelmann noted that he initially saw Plaintiff for elevated liver enzymes and abdominal pain, and that Plaintiff was found to have multiple colonic polyps, Schatzki's Ring, esophagitis, and a small hiatal hernia. *Id.* Plaintiff had no gastrointestinal complaints and was continued on Protonix. R. at 394. On April 18, 2005, Plaintiff presented to Heinzelmann with complaints of losing fat from his upper extremities to his abdomen, being "all dried up," and occasional gas bloat symptoms. R. at 391. Heinzelmann told Plaintiff to try over the counter medicines for gas bloat, and to continue his use of Protonix. *Id.*

On May 5, 2005, Plaintiff presented to Dr. Theodore T. Faber ("Faber") at the South Carolina

Neurology Clinic and reported that his "tired spells" turned out to be sleep apnea. R. at 282. Plaintiff indicated that he was now using a CPAP machine and doing much better. *Id.* Faber noted that Plaintiff had had no seizures in over a year, indicating that Plaintiff's seizure disorder was in good control. *Id.* Plaintiff was continued on Dilantin. *Id.*

On May 11, 2005, Plaintiff had an endocrine follow up visit with Dr. Jimmy D. Alele ("Alele"). R. at 312-14. Alele noted that Plaintiff had had pituitary surgery and that subsequent pituitary MRIs have revealed that Plaintiff's pituitary tumor is stable. R. at 312. Alele further noted that Plaintiff had multiple endocrine tests in the past, which showed that Plaintiff had a normal insulin-like growth factor level, normal testosterone, normal thyroid function, and normal cortisol level. *Id.* Alele concluded that there did not appear to be an endocrine problem that could explain Plaintiff's symptoms. R. at 313-14.

On June 20, 2005 Plaintiff reported to Dr. James Dickson ("Dickson") for an eye exam. R. at 340. Plaintiff complained about a cracked rib and losing body fat. *Id.* No vision problems related to Plaintiff's pituitary tumor were discovered. *Id.*

On June 28, 2005, Plaintiff presented to Dr. William H. Crigler ("Crigler") with chest and rib pain. R. at 244. Plaintiff complained that his pituitary tumor was causing him to lose body fat. *Id.* Plaintiff's dose of Zoloft was increased and Plaintiff was continued on his other medications. *Id.* On July 28, 2005, Plaintiff complained to Crigler that he suffered from sleep apnea and tired spells, and that he was losing body fat. R. at 245. Crigler suggested that Plaintiff needed to be referred to an endocrinologist. *Id.* On September 27, 2005, Plaintiff reported to Crigler that he was "wasting away." R. at 246. Crigler concluded that Plaintiff was "obsessive" about his body fat. *Id.*

On November 23, 2005, Plaintiff reported to Faber that he had had seizures the previous

4

weekend. R. at 360. Plaintiff reported that on Saturday, he felt funny, had a seizure, and woke up fatigued. *Id.* Plaintiff reported having another seizure on Sunday. *Id.* Plaintiff was continued on Dilantin and prescribed Lyrica for additional seizure control. R. at 360.

On December 6, 2005, Crigler authored a letter stating: "Mr. Bates appears to have an unusual obsession regarding loss of muscle, a concern that dominates each visit hence my opinion that he suffers from an obsessive compulsive disorder." R. at 242. Crigler suggested a psychological evaluation. *Id.* On December 7, 2005, Plaintiff reported to Faber that he had been suffering from seizures. R. at 359. Plaintiff was continued on Lyrica and Dilentin. *Id.* Faber noted that Plaintiff would see Dr. Eric L. Klett ("Klett") regarding his wasting disorder. R. at 359.

On December 8, 2005, Plaintiff had an initial evaluation with Klett. R. at 495. Plaintiff complained of drying up, which he reported had been ongoing for 5-6 years. *Id.* Klett hypothesized that Plaintiff's complaints could be secondary to Dostinex therapy, but Klett was unaware of any similar complaints associated with Dostinex. *Id.* Klett noted that Plaintiff's residual tumor continued to secrete prolactin despite Plaintiff's use of Dostinex. *Id.* Klett also noted that Plaintiff appeared "well replaced with thyroid hormone" and had adequate amounts of testosterone. *Id.* Plaintiff had an MRI, but no real changes were noted in comparison with Plaintiff's MRI from 2003. *Id.*

On December 10, 2005, Plaintiff's mother completed a Function Report on behalf of Plaintiff. R. at 152-59. Plaintiff's daily activities were listed as: getting dressed, making his bed, checking his medications, going out for breakfast, running errands at the pharmacy and grocery store with his mother, watching TV, going to church on Sundays, and looking at old cars. R. at 152. Plaintiff reportedly could "make[] a sandwich or prepare[] breakfast once or twice a week[,]" sweep

5

the kitchen and vacuum about once a week, and do "a little" yard work in the summer. R. at 152, 154. Plaintiff drove a vehicle, shopped for food and clothing once a month, regularly attended doctor and dentist appointments and went to the pharmacy. R. at 152, 156. Plaintiff and his mother also visited with friends and relatives once or twice a week. R. at 156. Plaintiff could only pay attention for a few minutes, but could follow instructions if they were not too complicated. R. at 157. Plaintiff did not need any special reminders to take care of his personal needs and grooming. R. at 154. Plaintiff's mother kept up with most of the bills and Plaintiff's medications because of Plaintiff's memory loss. R. at 155-56. Plaintiff reportedly was depressed a lot and when depressed, would lose interest in most activities. R. at 157. Plaintiff's function report also states:

> I have wasting away of body fat and tired spells every day. This makes it painful for lifting, squatting, bending, standing, reaching, walking, sitting kneeling, stair climbing, completing tasks and using hands. I have pituitary tumor and seizures these cause memory loss, poor concentration and sometimes poor understanding. The tired spells are energy draining.

R. at 157.

On December 17, 2005, Faber wrote a letter to the SSA about Plaintiff. Faber's letter states:

> This letter is to certify that this patient has been under my care for many years with a history of seizure disorder. He also appears to suffer from some form of "wasting disorder" as he put it which has yet to be explained despite numerous investigations by his physicians. He appears to be slowly worsening. His fatigue level is very great. He reports he is quite frustrated and may be developing some depression as a result of his condition. I do not believe that he will be able to competitively perform in the labor market.

R. at 268.

On December 27, 2005, Dickson wrote a letter to Klett indicating that he had been Plaintiff's eye doctor for over ten years and that Plaintiff has been "remarkably stable from an ocular standpoint since his [pituitary] surgery," but that Plaintiff had a recurring benign eccrine cyst. R. at 500.

Dickson also stated that Plaintiff's ocular health was "age appropriate." *Id.*

On January 1, 2006, Plaintiff had a followup visit with Klett. R. at 493. Plaintiff complained again that his body was drying up, that he had very poor muscle tone, loss of peripheral fat, and increased abdominal girth, all of which he attributed to his pituitary surgery. *Id.* Klett noted that Plaintiff continued to have elevated prolactin levels, but that these levels had been stable over the past five years since Plaintiff had been placed on dopamine agonist therapy. *Id.* Plaintiff was continued on Dostinex. *Id.* With regard to Plaintiff's complaints of drying up, Klett noted that he "believe[d] Plaintiff's symptomology[,]" but had nothing further to offer Plaintiff. R. at 494. Klett advised Plaintiff to see Dr. Mary Lee Vance ("Vance") about his symptoms. *Id.*

On March 17, 2006, Dr. Robespierre M. Del Rio ("Del Rio") completed a comprehensive psychiatric mental status examination on Plaintiff. R. at 249. Del Rio noted that Plaintiff had not made contact with a local area mental health clinic, or with a psychiatrist or psychologist. R. at 250. Plaintiff's affect was depressed and anxious with a congruent mood, but Plaintiff denied having any active suicidal or homicidal ideation, plan or intent. *Id.* Del Rio noted that Plaintiff was able to maintain activities of daily living including personal hygiene. R. at 251. Del Rio concluded that Plaintiff's symptoms suggested a diagnosis of depressive disorder not otherwise specified, seizure disorder, hypothyroidism, status post pituitary tumor excision, sleep apnea, and bilateral deafness improved with a hearing aid. R. at 252.

On April 3, 2006, a medical evaluation on Plaintiff was completed based upon Plaintiff's medical records. R. at 253. No evidence of any significant limitations related to Plaintiff's pituitary tumor, thyroid problems or hearing loss was found. R. at 253. It was noted that Plaintiff did not "appear to have had any [seizures] in quite some time" and there was no evidence of any "significant

bleeding or weight loss." R. at 253-54. It was concluded that there was "no evidence of any real significant physical impairments" and that Plaintiff's "main issues appear[ed] to be mental." R. at 254. Also on April 3, 2006, Manhal Wieland ("Wieland"), a state psychiatric consultant, completed a psychiatric review technique on Plaintiff. R. at 255. Wieland determined that Plaintiff had mild restrictions in activities of social living, difficulties in maintaining social functioning, and difficulties in maintaining concentration persistence or pace; and no episodes of decompensation of extended duration. R. at 265. Wieland concluded that Plaintiff had depressive disorder not otherwise specified, and that Plaintiff's mental condition posed no more than a minimal impact or limitation on Plaintiff's ability to perform work. R. at 258, 267.

On April 17, 2006, Plaintiff presented to Dr. David Lyle ("Lyle") at Lexington Family Practice for an initial evaluation. R. at 363. Plaintiff complained of fatigue, difficulty sleeping seizure disorder and muscle wasting. *Id.* Lyle noted that Plaintiff's seizures had been under control until recently and that Plaintiff reported having five seizures the day before his appointment followed by a period of somnolence. *Id.* Plaintiff indicated that he would follow up with Faber regarding his seizures. *Id.* Lyle's notes state that Plaintiff "produce[s] lab work, which shows a growth hormone deficiency with loss of muscle/fat around his upper extremities and more deposit about the abdomen." R. at 363. Lyle noted that despite Plaintiff's complaints, Plaintiff's muscle mass and adipose around the abdomen seemed appropriate. *Id.*

On May 9, 2006, Plaintiff consulted with Dr. Richard K. Bogan ("Bogan") complaining of tiredness despite using his CPAP machine. R. at 354. Bogan noted that Plaintiff was a well-developed male and that his weight had been stable over the past 3-4 years, but that Plaintiff believed he was losing muscle mass. *Id.* Plaintiff reported that he was getting seven to eight hours of sleep

a night, but that his sleep was unsatisfactory and Plaintiff was fatigued during the day. *Id.* Bogan concluded that Plaintiff's sleep apnea was partially corrected with a CPAP machine, and increased Plaintiff's CPAP pressure to 9 centimeters of water. R. at 244.

On June 2, 2006, Plaintiff reported to Faber that he had had some seizures. R. at 358. Plaintiff and Faber spoke at length about further evaluating Plaintiff's seizures. R. at 358. Faber increased Plaintiff's Lyrica dose and referred Plaintiff to the Medical University of South Carolina for possible seizure surgery. *Id.*

Sometime after June 9, 2006, Plaintiff completed an updated disability Report. R. at 161-68. Plaintiff stated that his "wasting of body fat" was worsening, he was experiencing periods of severe fatigue more often each day, and that his depression was worsening. *Id.* Plaintiff indicated that "depression and fatigue interfere with [his] daily activities and sometimes [he] do[es]n' t feel capable of doing anything." R. at 162. Plaintiff also stated that he was now having "gastrointestinal problems for a while [sic] now" and that these problems have been worse for the last month or so. *Id.* Plaintiff listed his medications as Dilantin (seizures), Dostinex (pituitary tumor), Lyrica (seizures), Protonix (acid reflux), Synthroid (thyroid), and Zoloft (depression). R. at 154. Plaintiff stated that when he suffers from seizures he needs someone with him because he is unable to care for himself. R. at 166. Plaintiff also stated that his memory loss and hearing loss were worse. R. at 166.

On June 27, 2006, Plaintiff presented to Bogan regarding his sleep apnea reporting that although he was using his CPAP nightly, he was still experiencing some sleepiness and fatigue in the morning hours. R. at 530. Plaintiff reported, however, that he was generally able to function adequately during the day. *Id.*

On July 6, 2006, Darla Mullaney ("Mullaney"), a medical consultant, completed a residual functional capacity assessment of Plaintiff. R. at 369-75. Mullaney determined that Plaintiff has no exertional limitations, no postural limitations, no manipulative limitations, no visual limitations, and no communicative limitations. R. at 369, 370, 371, 372. Mullaney found no evidence that Plaintiff had difficulty hearing when he wore hearing aids, but concluded that Plaintiff should avoid concentrated exposure to noise, and avoid all exposure to hazards such as machinery and heights. R. at 372, 375. Mullaney took note of Faber's opinion that Plaintiff could not perform competitively in the labor market, but also noted that the issue of disability is reserved for the Commissioner. R. at 374.

On July 12, 2006, Plaintiff was evaluated by Vance at the neuroendocrine-pituitary clinic at the University of Virginia. R. at 376. Plaintiff complained that he was "drying up" and losing fat and mass in his upper and lower extremities. *Id.* It was noted that Plaintiff's weight was stable, his strength intact, and that Plaintiff's extremities appeared to be of normal muscle mass and bulk. R. at 378. Vance determined that Plaintiff did not have a growth hormone deficiency and concluded that the most likely explanation for Plaintiff's complaints of a decrease in body mass and change in body composition was chronically low testosterone levels. *Id.* Vance informed Plaintiff that the six months of testosterone therapy that he had received in the past was not long enough to make a difference. *Id.* Vance noted that Plaintiff did not seem satisfied with her conclusions. R. at 381.

On July 25, 2006, Plaintiff presented to Klett for a followup after Plaintiff's consultation with Vance. R. at 491. Klett noted that Vance concurred with most of Plaintiff's previous endocrinologists' decisions that Plaintiff is growth hormone sufficient and should be placed on testosterone therapy to improve muscle mass and loss of peripheral fat. *Id.* Plaintiff continued to

insist that he should be started on growth hormone therapy, but Klett agreed with Vance and started Plaintiff on testosterone therapy. R. at 491.

On September 14, 2006, Plaintiff reported to Faber that he had six seizures on August 17th. R. at 227 and 411. Plaintiff was continued on Dilantin and his Lyrica dose was increased. R. at 227 and 411. On October 23, 2006, Plaintiff reported to Faber that he had had a seizure the previous Friday. R. at 226. It was noted that Plaintiff had a good memory, which was appropriate for his age, good strength in his upper and lower extremities, and no atrophy. *Id.* Faber recommended that Plaintiff have an EEG and MRI, and that Plaintiff's Dilantin level be checked. *Id.*

On November 7, 2006, Plaintiff had an EEG, the results of which came back normal. R. at 225 and 408. That same day, Faber, in the presence of Plaintiff and his mother, filled out a questionnaire regarding Plaintiff's conditions. R. at 382-85. With regard to listings 11.05 and 11.03, Faber wrote that Plaintiff "does not have seizures more than every 4 or 5 weeks," but that Plaintiff "has both convulsive and nonconvulsive seizures." R. at 382. With regard to listing 11.05, Faber indicated that Plaintiff's "sequelae including the nonconvulsive epilepsy symptoms" are a condition of equal severity as a tumor for Plaintiff. R. at 383. However, Faber indicated that Plaintiff's seizures, when combined with his alleged ongoing muscle wasting, were not a condition of equivalent severity to the basic condition of nonconvulsive epilepsy because Faber did not find any muscle wasting. *Id.* Faber also indicated that Plaintiff has problems with short term memory that might impair his concentration ability, but that Faber had not established that Plaintiff's concentration was impaired to such an extent that Plaintiff could not concentrate for two consecutive hours. R. at 384. With regard to functional limitations, Faber wrote that it would not be safe for Plaintiff to work around any kind of machinery with moving parts or sharp edges and that he had

counseled Plaintiff "several times in the past regarding prohibited activity including driving, dangerous/heavy machinery, heights, and aquatic environments." *Id.* Faber indicated that it would be safe for Plaintiff to lift weights of even 5 to 10 lbs for up to 2 1/2 hours per day. *Id.* Faber also indicated that Plaintiff could not perform work where he was required to do team-type employment where other workers were relying on him to maintain concentration, persistence and pace. R. at 385. Faber indicated that Plaintiff should be permitted to rest on an as-needed basis at his own option at unscheduled intervals during the day without any advance notice. *Id.* On November 11, 2006, Plaintiff reported to Faber that he had had no seizures since his last appointment and that he did not want to do an MRI. R. at 409. Plaintiff was continued on Lyrica and Dilantin. *Id.*

On December 7, 2006, Plaintiff's mother brought him to the Lexington Medical Center where he was seen by Dr. Suzanne Schwab ("Schwab"). Plaintiff reportedly had a seizure at home for about five minutes, had a five-minute seizure in the waiting room, and a third seizure in front of Schwab. R. at 470. Schwab noted that during Plaintiff's seizure, he had a distant gaze and his lower extremities jerked. *Id.* Lab work indicated a normal therapeutic Dilantin level. *Id.* Schwab consulted with Faber, who stated he had tried Plaintiff on just about every medication and did not know what else to do with Plaintiff. R. at 471. Plaintiff was observed for approximately four hours and then discharged. R. at 470.

On December 14, 2006, Plaintiff presented to Faber complaining of a recent flurry of seizures. R. at 224. Plaintiff's medication level was found to be therapeutic. *Id.* Faber noted that Plaintiff was obsessed with body wasting, and that Plaintiff had good strength in his upper and lower extremities, no atrophy or fasciculations, no abnormal movements, and no tone change. R. at 224, 407.

On December 19, 2006, Plaintiff presented to Klett complaining of "drying up" and loss of peripheral fat.  R. at 489.  Klett noted that Plaintiff reported having a seizure on December 14, 2006, and that Plaintiff had a recurrence of seizures recently after a four-year period of time without any seizure activity.  *Id.*  Klett increased Plaintiff's testosterone dose because Plaintiff had had no significant improvement in his muscle mass and bulk.  R. at 490.

On December 20, 2006, Plaintiff presented to Dr. William C. McLain ("McLain") for a checkup regarding his sleep apnea.  R. at 528.  Plaintiff reported that he was "doing great" and that his CPAP was helping. *Id.*

On February 12, 2007, Plaintiff presented to Lyle and again complained that his body was all dried up.  R. at 386.  According to Lyle, Plaintiff "typically pats his arms and squeezes his abdominal adipose and [then] has [a] somewhat bizarre discussion of not being normal, losing fat and being 'dried up.'" *Id.*  On June 15, 2007, Plaintiff, accompanied by his mother, consulted with Lyle about seeking disability benefits.   R. at 433.  Both Plaintiff and his mother reported that Plaintiff was able to do some odd jobs such as carrying dirt in a pickup truck. *Id.*  Lyle noted that Plaintiff has been evaluated by several endocrinologists who feel Plaintiff does not have a growth hormone deficiency.  R. at 434.  Lyle assessed Plaintiff as having "multiple medical issues involving sequelae from his surgery as well as a seizure disorder, hearing loss and depression." *Id.*  Lyle concluded:

> Though the patient is physically able to do manual labor, it is hard to imagine how he will continue to be able to function independently and therefore, in my opinion, he qualifies for disability.  He is able to function at home because his mother who is somewhat elderly is able to maintain a home environment for him.

*Id.*

13

On August 8, 2007, Plaintiff had an appointment with McLain regarding his sleep disordered breathing. R. at 526. Plaintiff reported having "spells of feeling weak and tiredness [that] seems to come on relatively suddenly, making him sleepy." *Id.* McLain hypothesized that these tired spells might be "seizure-like" activity. *Id.* Plaintiff was advised to consult with Faber. *Id.* Plaintiff was continued on his CPAP. R. at 527.

3.     <u>Plaintiff's Medical History Subsequent to Date Last Insured</u>

On October 10, 2007, Plaintiff reported a recent flurries of seizures to Faber. R. at 223. Faber started Plaintiff on a repeat trial of Lamictal for six weeks. *Id.* On October 11, 2007, Plaintiff was evaluated by Lyle and assessed as having acquired hypothyroidism and recurrent depression. R. at 430. Plaintiff was given refills for Synthroid and Zoloft. *Id.* On December 4, 2007, Plaintiff had an MRI, which showed that Plaintiff's pituitary tumor status appeared to be unchanged from the 12/21/2005 study. R. at 517.

On December 21, 2007, Plaintiff presented to Klett with complaints of "drying up" and losing peripheral fat. R. at 487. It was noted that Plaintiff had gained weight and that Plaintiff had discontinued testosterone therapy because of difficulties passing urine. *Id.* Plaintiff denied any seizures or seizure activity since his last visit. *Id.* Klett explained to Plaintiff that his complaint of drying up was not secondary to a growth hormone deficiency, despite Plaintiff's belief to the contrary. *Id.*

On August 15, 2008, Dr. Mary Lynn Kemick ("Kemick") with Lexington Endocrinology authored a letter stating that she was following Plaintiff for a history of pituitary macroadenoma. Kemick states:

> The patient underwent craniotomy in 1998 and has continued on therapy for

14

hyperprolactinemia with Dostinex. He has difficulty with continued headache. He is having difficulty with multiple myalgias and arthralgias and he does have associated thyroid dysfunction. His past medical history also includes a seizure disorder secondary to a head trauma and difficulty with his hearing. He has difficulty with generalized fatigue and weakness. His condition is permanent without possibility of improvement. There is a potential that he will develop full pituitary deficiency and he does need to be followed closely. Please consider him for disability in light of this and his other medical history.

*Id.*

On August 16, 2008, Plaintiff's mother completed a Disability Report about Plaintiff. R. at 209-216. The form states that Plaintiff's condition was worsening with respect to: "wasting of body fat, more aches and pains in joints, more headaches, depression is much worse, gastrointestinal problems are worse, seizures come more often. Memory loss is more pronounced, cysts around eyes have grown larger, spells of fatigue are worse." R. at 209. Crigler's notes from August 25, 2008 state that Plaintiff complained of tiredness, being dried up, and losing body fat. R. at 248.

On September 24, 2009, Dr. James Selph ("Selph"), a neurologist, wrote a letter indicating that he had been following Plaintiff for about half a year. R. at 571. Selph's letter states that Plaintiff's seizures are persistent and incompletely controlled, and that Plaintiff experiences depression after seizures. *Id.* Selph also states:

I was recently informed that the patient had been denied disability. Though at Neurology Clinic you do see many patients that apply for disability that are not good candidates, I do think in this case that Mr. Bates is a good candidate for disability. I think that his appeal for disability should be reconsidered.

R. at 571.

**B.    Administrative Hearing**

At the administrative hearing, Plaintiff testified that his mother moved in with him after his divorce in 1990 to help take care of him. R. at 41-42. Plaintiff testified that he owned a backhoe,

but did not use it much, stating he used it "once in a blue moon." R. at 43-44. Plaintiff further testified that he no longer pulled the back hoe on a trailer and just uses the backhoe at the neighbors or down the street "once in awhile." R. at 45. Plaintiff testified that he still drove the backhoe. R. at 44. Plaintiff also testified that he still owned a dump truck, but that he was "getting rid of it." R. at 45. Plaintiff stated that he only does "what [his] mom can go with [him] and do" stating that he "still ha[s] to try to making a living a little bit." R. at 44, 45.

Plaintiff testified that his biggest problems were seizures, depression and growth hormone deficiency. R. at 47. Plaintiff testified that he had seizures "every couple, three weeks. . . . Sometimes four weeks" and that he took his medication as prescribed. R. at 47. Plaintiff also testified that he still had a valid commercial driver's license. R. at 61.

Upon inquiry by the ALJ about evidence of significant reduced growth hormone production, Plaintiff's counsel admitted that there was no such evidence available. R. at 47. Plaintiff's attorney further admitted that there was no evidence of muscle wasting or Plaintiff's related complaints. R. at 48. Plaintiff's counsel, citing obligations to the court, then advised the ALJ that he did not want to ask any questions of Plaintiff. R. at 48. Subsequently, outside of the presence of Plaintiff, Plaintiff's counsel stated the following to the ALJ:

> Your Honor, I was not aware of the use of the dump truck. . . . After this, I'm convinced by Your Honor's questions that the case should not be granted, however on short notice I feel like I have to protect him in the hearing. I'm not going to ask questions because I don't think I can ask questions that, that might, you know, bring forth an answer that might not be correct. I do believe the mother and I, I do want to ask the mother just some basic questions.

R. at 52-53. Plaintiff's counsel further advised the court that he would not appeal the case. R. at 53. After this exchange, the ALJ did not ask any further questions of Plaintiff. R. at 49.

Plaintiff's mother testified that Plaintiff had seizures, short-term memory loss, and hormone troubles related to his pituitary tumor. R. at 58-59. Plaintiff's mother testified that she and Plaintiff believed Plaintiff to have growth hormone problems because they had "read all sorts of things about this." R. at 59. Plaintiff's mother testified that Plaintiff's prior hormone tests had come back low, but within normal limits, and that Plaintiff was going to have another growth hormone test. R. at 59-60. With regard to Plaintiff's seizures, Plaintiff's mother indicated that the seizures:

> come sort of on a cycle where [Plaintiff] has a series of them for over the period of a day and maybe a day and a half, he might have 10 or so in that period of time and then for, you know, two or three weeks he probably won't have any more, then he'll have them again.

R. at 64.

Plaintiff's mother confirmed that Plaintiff owned a dump truck, trailer and a backhoe, and stated that Plaintiff "hardly ever" hauled his equipment anymore. R. at 57. Plaintiff's mother testified that she would accompany Plaintiff most of the time when he went out. R. at 56. Plaintiff's mother specifically stated that she accompanied Plaintiff any time he did any work. *Id.* Plaintiff's mother testified that she would accompany Plaintiff when he used the dump truck and backhoe because "he has seizures and [she] just want to make sure if he did have anything [she] could help him. . . ." R. at 63. Upon further questioning, Plaintiff's mother stated that Plaintiff "usually says he feels funny" when he is about to seize and that Plaintiff would pull over if this occurred. *Id.* Plaintiff's mother testified that although Plaintiff still drives, he only drives at times when he is not expecting to have a seizure and that Plaintiff's seizures usually start at night. R. at 64.

C.    **ALJ's Decision**

The ALJ made the following findings in his decision denying benefits:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2007.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 24, 2005, through his date last insured of September 30, 2007 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: hearing loss, history of seizure disorder, depression, status post excision of pituitary tumor, and side effect of medications (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform work with restrictions that required simple, routine tasks; a supervised environment; no required interaction with the public or "team"-type interaction with co-workers; no lifting or carrying over 50 pounds occasionally and 25 pounds frequently; no more than a low level of hearing acuity; and avoidance of hazards such as unprotected heights and dangerous machinery.

6. Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

7. The claimant was born on July 30, 1955, and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. He was 52 years of age, which is defined as an individual closely approaching advanced age 50-54, on the date of last insured.

8. The claimant has a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the dated [sic] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 25, 2005, through September 30, 2007, the date he was last insured for benefits (20 CFR 404.1520(g)).

R. at 20, 21, 29, 30, 31.

The ALJ determined that:

the claimant's medically determinable impairments of hearing loss, history of seizure disorder, depression, status post excision of pituitary tumor, and possible side effects of medications could reasonably be expected to produce some of the alleged symptoms; however, the claimant's allegations concerning impairments/disability and the inability to work are not substantiated by the total evidence of record and not credible.

R. at 26.  The ALJ noted that Plaintiff submitted a log of his seizure activity at the hearing, but found that the log was "inconsistent with the medical evidence and with [Plaintiff]'s reports regarding his seizure activity."  R. at 23.  The ALJ specifically stated:

The log indicates the claimant was having multiple seizures a day (sometimes up to seven) in 2006 and 2007.  However, this is clearly inconsistent with the . . . evidence which reflects the claimant and his physicians reported that his seizures were under good control.  The evidence does not indicate that the claimant required frequent emergency room treatment or inpatient hospitalization for uncontrolled seizures. There is no objective evidence that the claimant actually suffered from significant seizure activity since 2001, and the medical evidence does not confirm that he had seizure activity until December 7, 2006. . . .

R. at 23-24.  The ALJ also found that Plaintiff's complaints for fatigue, joint pain, and muscle wasting due to a growth hormone deficiency were not substantiated by the medical evidence.  R. at 24.

With regard to Plaintiff's depressive disorder, the ALJ noted that Plaintiff "continued to

19

engage in normal activities of daily living." R. at 25. The ALJ also noted that Plaintiff "was treated for depression by his family physician and never sought counseling or treatment by a mental health professional." R. at 25. The ALJ discussed the requirements of Listing 12.04 and determined that the medical evidence concerning Plaintiff's depression did not meet or medically equal § 12.04 of the listings stating: "While [Plaintiff]'s depression may cause some decreased concentration, decreased memory, and lack of interests, there is no evidence of bipolar or manic syndrome or any significant problems with anhedonia, appetite disturbance, decreased energy, feelings of guilt, or easy distractability." R. at 27. The ALJ determined that Plaintiff's depression "results in no more than mild restrictions of activities of daily living and moderate difficulties in maintaining social functioning" and that that although Plaintiff "may have moderate difficulties in maintaining concentration, persistence or pace on complex tasks and detailed instructions[,]" Plaintiff "should be able to attend to and perform simple tasks throughout the work day for at least two hours at a time with normal work breaks and without special supervision." R. at 27. The ALJ found "no evidence of episodes of related decompensation of extended duration." R. at 27. The ALJ concluded that Plaintiff's "depression restricts [him] to simple, routine tasks with no required interaction with the public or "team"-type interaction with co-workers. R. at 27.

With regard to other medical listings, the ALJ stated:

On November 7, 2006, Dr. Faber completed a questionnaire stating that [Plaintiff]'s seizure activity did not meet sections 11.03 or 11.05 of the Listings. He commented that [Plaintiff] did not have seizures more than every four or five weeks. He commented that [Plaintiff] did not have problems with short-term memory that might impair concentration.

R. at 29.

## II.  STANDARD OF REVIEW

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one.  Section 205(g) of the Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).  "Substantial evidence has been defined innumerable times as more than a scintilla, but less than a preponderance." *Thomas v. Celebrezze,* 331 F.2d 541, 543 (4th Cir. 1964).  This standard precludes a *de novo* review of the factual circumstances that substitutes the court's findings for those of the Commissioner.  *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971).  The court must uphold the Commissioner's decision as long as it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  "From this it does not follow, however, that the findings of the administrative agency are to be mechanically accepted.  The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969).  "[T]he courts must not abdicate their responsibility to give careful scrutiny to the whole record to assure that there is a sound foundation for the [Commissioner's] findings, and that his conclusion is rational." *Vitek*, 438 F.2d at 1157-58.

The Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  However, the Commissioner's denial of benefits shall be reversed only if no reasonable mind could accept the record as adequate to support that determination. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

### III. THE APPLICABLE LAW AND REGULATIONS

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability." 42 U.S.C. § 423(a). Disability is defined in 42 U.S.C. § 423(d)(1)(A) as: "[the] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

The Social Security Act has, by regulation, reduced the statutory definition of "disability" to a series of five sequential questions that are to be asked during the course of a disability determination. The five questions are: (1) is the claimant engaged in substantial gainful activity; (2) does the claimant have a severe impairment or combination of impairments; (3) does the claimant have an impairment that meets or equals one of the listings in the appropriate appendix; (4) is the claimant prevented by the impairment or combination of impairments suffered from engaging in his or her relevant past employment; and (5) does the claimant have the ability to engage in other gainful activity considering his or her age, education, past relevant experience, and residual functional capacity. *See* 20 C.F.R. § 404.1520 (2007). An individual may be determined not disabled at any step if found to be: gainfully employed, not severely impaired, not impaired under the Listing of Impairments, or capable of returning to former work. In such a case, no further inquiry is necessary.

### IV. DISCUSSION

**A.    Medical Listings**

Plaintiff objects to the Magistrate Judge's recommendation that the decision of the ALJ be affirmed stating: "nowhere in their discussion do the ALJ or the Magistrate Judge explain their

decision that the Plaintiff does not have an impairment or combination of impairments that met or medically equaled one of the listed impairments." Pl. Obj. at 1. Plaintiff asserts that he does have a combination of impairments that medically equals the listings, and that Faber's answers to the Disability Questionnaire indicate that Plaintiff's impairments meet or exceed Listings 11.05 and 11.03. Pl. Obj. at 1, 4.

A claimant's impairment meets a Listing if "it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." 20 C.F.R. § 404.1525(c)(3). The impairment medically equals a Listing "if it is at least equal in severity and duration to the criteria of any listed impairment." *Id.* § 404.1526(a). If a claimant has a listed impairment, but: 1) does "not exhibit one or more of the findings specified in the particular listing, or" 2) exhibits "all of the findings, but one or more of the findings is not as severe as specified in the listing," the claimant's impairment is medically equivalent to the listing if the claimant has "other findings related to [his or her] impairment that are at least of equal medical significance to the required criteria." 20 C.F.R. § 404.1526(b)(1).

In conducting a substantial evidence inquiry, the court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his or her rationale. *Durham v. Apfel*, 225 F.3d 653 (Table), 2000 WL 1033060, at *3 (4th Cir. July 27, 2000) (citing *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998)). The Fourth Circuit has stated that "[j]udicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *Wyatt v. Bowen,* 887 F.2d 1082 (Table), 1989 WL 117940, at *4 (4th Cir. 1989) (quoting *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)).

With regard to Listing 12.04, which deals with affective disorders, including depression, the

ALJ detailed the listing requirements and determined that Plaintiff's diagnosis of depression, not otherwise specified, did not meet these requirements.  With regard to Listings 11.03 and 11.05, the ALJ did not explain the requirements of listing 11.03 and 11.05 or detail his rationale for why Plaintiff's impairments did not meet or medically equal Listings 11.03 and 11.05.  *See* R. at 29.  The ALJ merely stated that Faber completed a questionnaire stating that Plaintiff's seizure activity did not meet sections 11.03 or 11.05.  R. at 29.  Faber indicated that: 1) Plaintiff did not meet the requirements of listings 11.03 and 11.05; and 2) Plaintiff's epilepsy, when combined with Plaintiff's muscle wasting, were not a condition of equal severity to Listing 11.03.   However, Faber also indicated that Plaintiff's "sequelae including the nonconvulsive epilepsy symptoms . . . are a condition of equal severity" to Listing 11.05.  R. at 382.  The ALJ's conclusion that Plaintiff's impairments did not meet or medically equal the listing requirements of 11.05, is not supported by Faber's opinion, and is therefore inadequately explained.   The case is remanded for a proper determination of whether Plaintiff has an impairment that is of medically equal severity to Listing 11.05.[2]  If the ALJ requires more information from Faber to conduct this analysis, he may obtain this

---

[2] Listing 11.05 provides that the required level of severity of benign brain tumors is met when listings 11.02, 11.03 or 11.04, or the criteria of the affected body system are met.  20 C.F.R. § 404 Subpt P, App. 1 § 11.05.  Listing 11.02 provides that the required level of severity of  convulsive epilepsy is met when a social security claimant has: "convulsive epilepsy . . . documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment." *Id.* §. 11.02.  This includes daytime episodes involving loss of consciousness and convulsive seizures, or nocturnal episodes "manifesting residuals which interfere significantly with activity during the day." *Id.*  Listing 11.03 provides that the required level of severity of nonconvulsive epilepsy is met when a social security claimant has:

> nonconvulsive epilepsy . . . documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. § 404 Subpt P, App. 1 § 11.03.  Listing 11.04 provides that the required level of severity for central nervous system vascular accident is met when a claimant has one of the following more than 3 months post-

information pursuant to 20 C.F.R. § 404.1512(e).

**B.      Adequacy of Hearing Representation**

Plaintiff objects to the Magistrate Judge's conclusion that Plaintiff has no grounds for redress of his claim that he was not adequately represented at his hearing before the ALJ and therefore did not receive a fair hearing. Pl. Obj. at 2. Plaintiff contends that his attorney prejudiced the case and that Plaintiff was not given an adequate opportunity to present his case. *Id.* Plaintiff specifically contends that he and his mother were not adequately questioned or given the opportunity to thoroughly discuss Plaintiff's activities and limitations. Pl. Obj. at 3.

The Magistrate Judge is correct that a social security claimant has no right to counsel, and therefore cannot make a claim for ineffective assistance of counsel. *See Duggan v. Barnhart*, 66 F. App'x 730, 732 (9th Cir. 2003); *Cornett v. Astrue*, 261 F. App'x 644, 651 (5th Cir. 2008); *Russell v. Chater*, 62 F.3d 1421, at *2 (8th Cir. 1995); *Slavin v. Commissioner*, 932 F. 2d 598, 601 (7th Cir. 1991).

However, 20 C.F.R. § 416.1450(a) provides that any party to a hearing has a right to appear before the administrative law judge to present evidence and state his or her position. *Id.* The Fourth Circuit has recognized that the failure to provide a claimant with a full and fair hearing in a disability case may be sufficient reason to remand a case for the taking of additional evidence. *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980). However, remand is dependent upon a showing that "absence of counsel created clear prejudice or unfairness to the claimant." *Id.*

In *pro se* cases, ALJ's "have a duty to assume a more active role in helping claimants develop

---

vascular accident: 1) "Sensory or motor aphasia resulting in ineffective speech or communication;" or 2) "Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." *Id.* at § 11.04.

the record." *Id.* (citing *Crider v. Harris*, 624 F.2d 15 (4th Cir. 1980)); *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir.1980) (stating that when a claimant appears without counsel, the ALJ should "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and that "[w]here the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant the case should be remanded.")

A reading of the hearing transcript reveals that Plaintiff's counsel declined to question Plaintiff due to "obligations to the Court." R. at 48. The actions of Plaintiff's counsel, in essence, left Plaintiff to appear *pro se*. As a result, the ALJ was obligated to take a more active role in developing the record. Although the ALJ began the hearing by asking Plaintiff some questions, upon learning that Plaintiff's counsel did not intend to ask Plaintiff any questions, the ALJ declined to ask any additional questions of Plaintiff. *See* R. at 48-49. This was inconsistent with the ALJ's duty to develop the record. In addition, subsequent to the effective withdrawal of counsel, Plaintiff was not given an opportunity to present additional evidence or state his position to the ALJ. Plaintiff was not asked about, and was given no opportunity to explain: 1) the discrepancies between the seizure log and the medical records noted by the ALJ, 2) the effects of his depression, or 3) his symptoms of fatigue and muscle wasting. Plaintiff did not get a full and fair hearing because of counsel's decision not to question Plaintiff, the ALJ's failure to develop the record, and the ALJ's failure to afford Plaintiff an opportunity to present his own case. This case is remanded for proceedings consistent with this order. Plaintiff shall be afforded an opportunity to present evidence and state his position as required by 20 C.F.R. § 416.1450(a). Because this case is being remanded for a new hearing before the ALJ, the court does not reach Plaintiff's objections with regard to the ALJ's

credibility determination and treatment of the statements of treating physicians.

## **CONCLUSION**

The court declines to adopt the report and recommendation of the Magistrate Judge. This case is remanded pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

s/ Margaret B. Seymour
Margaret B. Seymour
United States District Judge

March 24, 2011
Columbia, South Carolina